RANDY S. GROSSMAN
Acting United States Attorney
LYNDZIE M. CARTER
Assistant U.S. Attorney
Kansas Bar No. 25773
California Bar No. 327930
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
(619) 546-8780
Lyndzie.Carter@usdoj.gov
Attorneys for the United States

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PEDRO BERNAL-COTA,<br><br>Defendant. | Case No.:  21-CR-2274-TWR<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INFORMATION UNDER *ARLINGTON HEIGHTS* [ECF NO. 26]** |

**I**

**INTRODUCTION**

Defendant contends that § 1326 violates the Equal Protection Clause of the Fifth Amendment because it does not meet the heightened scrutiny called for by Village of Arlington Heights v. Metropolitan Development Corp., 429 U.S. 252 (1977), which allows courts to consider legislative intent when resolving an equal protection challenge. Defendant's reliance on Arlington Heights is misplaced.  The Supreme Court and Ninth Circuit have held that rational basis scrutiny applies to equal protection challenges to Federal immigration laws, and § 1326 easily meets this standard.  Further, the Immigration and Naturalization Act of 1952 (1952 INA)—not the Undesirable Aliens Act of 1929 (1929 UAA), as Defendant urges—contained the law that was later codified as § 1326.  The legislative history for the 1952 INA, which repealed the 1929 UAA, contains no evidence of racial animus.  Thus, even if the Court were to apply Arlington Heights, Defendant's argument still fails.  The Motion to Dismiss should be denied.

## II

## STATEMENT OF FACTS

On July 7, 2021, Border Patrol Agent Knott was assigned to the Interstate 8 Westbound Border Patrol Immigration Checkpoint in the Camp Border Patrol Station's area of responsibility when Honda Civic with two visible passengers approached the primary inspection. Compl. at 2. This area is approximately five miles east of the Tecate, California Port of Entry and approximately fourteen miles north of the border. Id. Agent Knot received consent to search the vehicle's trunk and discovered two individuals curled up in the truck, one later identified as the Defendant. Id. Agent Knott conducted an immigration inspection, during which Defendant admitted that he is a citizen of Mexico without any documents allowing him to enter or remain in the United States legally. Id. Defendant waived his Miranda rights, and during the post-arrest interview, repeated those admissions and stated that he entered the United States on July 4, 2021, with an intended destination of North Carolina. Id.

Defendant made his initial appearance on July 8, 2021. ECF No. 4. On August 5, 2021, Defendant was arraigned on a single-count information charging Defendant with being a removed alien found in the United States in violation of § 1326(a). ECF No. 18. Defendant pleaded not guilty to the information the same day. ECF No. 19. On October 8, 2021, Defendant filed this motion to dismiss. ECF No. 26.

## III

## ARGUMENT

Defendant contends the information must be dismissed because under Arlington Heights § 1326 violates the Equal Protection Clause. His reliance on Arlington Heights is misplaced: rational basis scrutiny applies, and § 1326 easily satisfies this lower standard. Regardless, even under the more exacting Arlington Heights standard, Defendant's equal protection argument fails.

//

//

**A.** **Rational Basis Scrutiny Applies; Arlington Heights Does Not**

It is well settled that Congress has "plenary power" over immigration matters. Kleindeinst v. Mandel, 408 U.S. 753, 766 (1972) (quoting Boutilier v. I.N.S., 387 U.S. 118, 123 (1967)); United States v. Hernandez-Guerrero, 147 F.3d 1075, 1076 (9th Cir. 1998) ("Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (quoting Fiallo v. Bell, 430 U.S. 787, 792 (1977) (internal quotation marks and citation omitted))). Because Congress's actions regarding "the power to expel or exclude aliens" is "largely immune from judicial control," Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953), only "narrow judicial review" is permitted in the immigration context. Hampton v. Mow Sun Wong, 426 U.S. 88, 102 n.21 (1976); accord Fiallo, 430 U.S. at 792; Mathews v. Diaz, 426 U.S. 67, 81-82 (1976).

The scope of this judicial review was discussed in Kleindienst v. Mandel, 408 U.S. 753, 769 (1972). In addressing a constitutional challenge to the denial of a visa to a proposed speaker at a conference, the Supreme Court limited its review to whether any "facially legitimate and bona fide" reasons existed for the denial. Id. The Court instructed that when such a reason is found, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against [constitutional] interests [of citizens]." Mandel, 408 U.S. at 770; accord Fiallo, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort to probe the justifications for the legislative decision."). For decades, the Supreme Court's "opinions have reaffirmed and applied [Mandel's] deferential standard of review across different contexts and constitutional claims" concerning Federal immigration law. Trump v. Hawaii, 138 S. Ct. 2392, 2419 (2018). This standard of review is the equivalent of rational basis review. Ledezma-Cosino v. Sessions, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (citations omitted).

In fact, the Ninth Circuit's *en banc* decision in Ledezma-Cosino confirmed that rational basis scrutiny applies specifically to equal protection challenges to Federal immigration law. The Court stated that "we have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context[,]" and to

support this statement, the appeals court quoted the portion of <u>Hernandez-Mancilla v. Holder</u> in which the court stated, "***We review equal protection challenges to federal immigration laws under the rational basis standard[.]***" 633 F.3d 1182, 1185 (9th Cir. 2011) (emphasis added), <u>quoted in</u> <u>Ledezma-Cosino</u>, 857 F.3d at 1049.

Section 1326 is a "criminal immigration statute," enacted pursuant to Congress's "sweeping power over immigration matters," and designed "to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." <u>Hernandez-Guerrero</u>, 147 F.3d at 1077–78. "It is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." <u>Id</u>. at 1078 (citations and internal quotation marks omitted). Accordingly, rational basis scrutiny applies. <u>See, e.g.,</u> <u>United States v. Navarrete-Castro</u>, No. 19-CR-2717-CAB (S.D. Cal. Nov. 19, 2020), ECF No. 70 (upholding § 1326 after applying rational basis scrutiny); <u>United States v. Rodriguez-Barios,</u> 20-CR-1684-LAB (S.D. Cal. Oct. 21, 2020), ECF No. 33 (same); <u>United States v. Novondo-Ceballos</u>, No. 21-CR-383, 2021 WL 3570229, at *3-*5 (D. N.M. Aug. 12, 2021) (same); <u>Palacios-Arias</u>, No. 3:20-CR-62-JAG, ECF No. 37 (same).

A review of <u>Arlington Heights</u> jurisprudence further shows that it has no applicability to immigration laws such as § 1326. Defendant's theory is that a law may violate the Equal Protection Clause of the Fifth Amendment if a legislature enacts "a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group." Def. Mot. at 3 (citing <u>Arlington Heights</u>, 429 U.S. at 265–68). However, none of the cases on which Defendant relies to argue for the application of <u>Arlington Heights,</u> <u>see</u> Def. Mot. at 4–7, 16, 20, 23–26, involved challenges to any Federal immigration statutes. <u>Arlington Heights</u> itself resolved a challenge brought under the Equal Protection Clause of the Fourteenth Amendment to the denial of a re-zoning request was found to be racially discriminatory. 429 U.S. at 254–60. <u>Arce v. Douglas</u> referred to <u>Arlington Heights</u> in considering First and Fourteenth Amendment claims regarding an Arizona law that eliminated a Mexican-American Studies program in Tucson public schools. 793 F.3d 968, 973, 977-81 (9th Cir. 2015). <u>Hunter v. Underwood</u> applied <u>Arlington Heights</u> to a

4

Fourteenth Amendment equal protection challenge to a provision of the Alabama state constitution that was enacted in 1901 and that disenfranchised individuals convicted of misdemeanors involving moral turpitude.  471 U.S. 222, 225-33 (1985).

Defendant also cites Democratic National Committee v. Hobbs, which had to do with an Arizona law that allegedly violated the Voting Rights Act of 1965 and the First, Fourteenth, and Fifteenth Amendments.  948 F.3d 989, 998, 1038–42 (9th Cir. 2020) (en banc); Def. Mot. at 16, 24.  The Ninth Circuit struck down the law after applying Arlington Heights.  Hobbs, 948 F.3d at 1038–42.  Defendant, however, fails to recognize that the Supreme Court reversed judgment.  Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2350 (2021).  Defendant also fails to recognize that the Supreme Court stated that the "'cat's paw' theory has no application to legislative bodies," id., which is a theory Defendant invokes in his brief (and is one we discuss below).

Finally, Defendant urges the Court to follow United States v. Carrillo-Lopez, No. 20-cr-00026, --- F. Supp. 3d ---, 2021 WL 3667330 (D. Nev. Aug. 18, 2021), the only case of which we are aware has stricken down § 1326 based on Arlington Heights.  Def. Mot. at 5, 20–21.  But that decision is fundamentally flawed: the Nevada court failed to mention that both Ledezma-Cosino, 857 F.3d at 1049, and Hernandez-Mancilla, 633 F.3d at 1185, hold that rational basis review applies specifically to equal protection challenges of immigration laws.  The court also gave short shrift to some of the Supreme Court precedents discussed above, namely: Mandel, 408 U.S. at 765, Fiallo, 430 U.S. at 792, and Trump, 138 S. Ct. at 2392.  See Carrillo-Lopez, 2021 WL 3667330, at *2.  Rather, the court relied upon cases that address far different circumstances than were before it to justify its decision to rely on Arlington Heights.[1]  Id. at *2–3.

Two examples are illustrative.  Quoting Wong Wing v. United States, the Nevada court determined that the "Supreme Court has held that greater protections under the Fifth

---

[1] We recognize that this Court sometimes has applied Arlington Heights to the same equal protection challenge Defendant brings in this case.  Gallegos-Aparicio, 2020 WL 7318124 at *1 (citing Rios-Montano, 2020 WL 7226441 at *1-*2).  However, for the reasons stated in this section, we respectfully disagree with the Court's analysis in those cases.

Amendment necessarily apply when the government seeks to 'punish[] by deprivation of liberty and property.'" Carrillo-Lopez, 2021 WL 3667330, at *2 (quoting 163 U.S. 228, 237 (1896)).   But Wong Wing resolved a claim by Chinese nationals that their imprisonment without a trial before a judge violated their due process rights, not an equal protection challenge to an immigration statute.   163 U.S. at 229.   The Nevada court also relied on Regents of the University of California v. U.S. Department of Homeland Security, 908 F.3d 476, 518-20 (9th Cir. 2018), which involved an equal protection challenge to the recission of the Deferred Action for Childhood Arrivals (DACA) program, and some of the parties to that suit were persons who had been allowed to remain legally in the United States while that program was in effect.   Carrillo-Lopez, 2021 WL 3667330, at *2.   The circumstances in Wong Wing and Regents, therefore, are very different than the circumstances here, where an alien admittedly in the United States illegally seeks to challenge the constitutionality of the illegal reentry statute.

In short, Defendant has failed to come forward with any Supreme Court or Ninth Circuit decisions in which Arlington Heights was applied to a Federal immigration law. Before Arlington Heights was decided, the Supreme Court established that rational basis is the level of scrutiny that applies to constitutional challenges in the immigration context. Mandel, 408 U.S. at 769.   And since Arlington Heights was decided, the Supreme Court and the Ninth Circuit both have reiterated that rational basis scrutiny applies to challenges to immigration laws, including equal protection challenges.   E.g., Trump, 138 S. Ct. at 2419; Ledezma-Cosino, 857 F.3d at 1049.   The fact that both before and after Arlington Heights was decided, the Supreme Court and Ninth Circuit were consistent in stating that rational basis scrutiny applies in the immigration context is a strong indicator that Arlington Heights does not apply in this case.

Another strong indicator that Arlington Heights is inapt for resolving Defendant's challenge is that the Supreme Court made clear both before and after it decided Arlington Heights that courts are not permitted to inquire into Congress's motives for enacting immigration laws.   Fiallo, 430 U.S. at 799 ("[I]t is not the judicial role in cases of this sort

6

to probe the justifications for the legislative decision [concerning immigration].”); Trump, 138 S. Ct. at 2419 (“the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification” against the asserted constitutional interests of United States citizens (citing Mandel, 408 U.S. at 770)).  In contrast to the bright-line rule that inquiry into Congress's motives is not permitted when resolving constitutional challenges to immigration statutes, Arlington Heights *demands* this type of far-reaching inquiry.  429 U.S. at 266–67.  Again, the consistent treatment of the scope of judicial review of Federal immigration laws both before and after Arlington Heights was decided shows that it is not appropriate to use it to resolve Defendant's equal protection challenge.

Finally, it is acceptable that “Congress regularly makes rules that would be unacceptable if applied to citizens.”  Mathews, 426 U.S. at 81–82.  In other words, Congress can push the boundaries further in laws directed to illegal aliens than it can push them in laws directed to citizens.  Soskin v. Reinertson, 353 F.3d 1242, 1254 (10th Cir. 2004) (citing Mathews, 426 U.S. at 78-83, for the principle that “Supreme Court precedent establish[es that] . . . the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis.”).  When considering this principle in combination with Congress's plenary power over immigration, it makes sense that the standard for evaluating equal protection challenges to Federal immigration statutes is more deferential than the standard that applies to equal protection challenges to laws brought by United States citizens.[2]

For these reasons, the Court should disregard Defendant's Arlington Heights arguments and Carrillo-Lopez and apply the standard that the Ninth Circuit has repeatedly stated applies: rational basis scrutiny.

_____

[2] States, by contrast, must provide a compelling reason to treat aliens differently from citizens.  E.g., Graham v. Richardson, 403 U.S. 365, 370–71 (1971).  Accordingly, perhaps Arlington Heights would be appropriate to rely upon to challenge a state law that is perceived to discriminate against aliens, given that the Supreme Court has instructed that heightened scrutiny applies to such a challenge.  But, as we have shown, the heightened scrutiny of Arlington Heights is not compatible with controlling precedent that judicial review of equal protection challenges to Federal immigration statutes proceeds under the rational basis standard.

**B.** **Under the Proper Standard, § 1326 Survives**

When applying rational basis scrutiny, the Court must uphold a Federal law if it is "rationally related to a legitimate government purpose." Hernandez-Mancilla, 633 F.3d at 1185. The statute is presumed constitutional, and the party challenging it has the burden "to negative every conceivable basis which might support it." Heller v. Doe, 509 U.S. 312, 320 (1993). The Government has no obligation to produce evidence supporting the statutory classification. Heller, 509 U.S. at 320; Aleman, 217 F.3d at 1201. As a threshold matter, Defendant's brief contains no analysis of the rational basis standard; thus, if the Court agrees with the Government that this is the proper standard of review, it may deny Defendant's motion without conducting any further analysis. Heller, 509 U.S. at 320; Aleman, 217 F.3d at 1201.

In any event, it is not credibly disputable that § 1326 is rationally related to a legitimate government interest. As noted above, § 1326 "is designed to effectively enforce the immigration laws. It is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." Hernandez-Guerrero, 147 F.3d at 1078 (citations and internal quotation marks omitted). "[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." Id. Consequently, several district courts, including this Court, have upheld § 1326 after applying rational basis scrutiny. E.g., United States v. Navarrete-Castro, No. 19-CR-2717-CAB (S.D. Cal. Nov. 19, 2020), ECF No. 70; United States v. Rodriguez-Barios, 20-CR-1684-LAB (S.D. Cal. Oct. 21, 2020), ECF No. 33; United States v. Novondo-Ceballos, No. 21-CR-383, 2021 WL 3570229, at *3-*5 (D. N.M. Aug. 12, 2021); Palacios-Arias, No. 3:20-CR-62-JAG, ECF No. 37. This Court should follow suit.

It is also obvious, as a matter of common sense, that Congress should have the power to prescribe, and the Executive should have the power to enforce, criminal sanctions in the case of non-citizens who violate the immigration laws by evading

1   immigration officials or by repeatedly returning to the United States despite lawful orders
2   not to do so.  The very fact that § 1326 cases occur—in this district very frequently—is a
3   testament to law's rationality, in the sense that without the deterrent "bite" that the law
4   provides there would be many, many more instances of non-citizens attempting to enter
5   the United States without proper documentation and without lawful authority.  The nation
6   has an inherent interest in ensuring that its own laws are followed, and § 1326 is a critical
7   tool in supporting that interest—particularly in border districts like this one.

8   **C.**     **Even If Arlington Heights Applies, § 1326 Still Survives**

9           Defendant contends that § 1326 fails to satisfy the rubric set forth in Arlington
10  Heights, and therefore, the Court must strike it down.   429 U.S. at 261–62, 265.
11  According to Defendant, "Congress enacted illegal entry with a discriminatory purpose"
12  because "racism and eugenics" were a motivating factor in the criminalization of illegal
13  entry that occurred when Congress passed the 1929 UAA.  Def. Mot. at 6.  To support his
14  argument, Defendant describes the following: some of the background of the passage of
15  the 1929 UAA (id. at 7–9), some of the sequence of events leading up to its passage (id.
16  at 9-11), portions of the legislative history of the 1929 UAA that contain provocative
17  comments by a few lawmakers concerning race (id. at 11–17), departures from normal
18  procedures or substantive conclusions that he perceives occurred during the passage of
19  the 1929 UAA (id. at 17–18), and his belief that that the current § 1326 disparately
20  impacts persons from Mexico and Latin America (id. at 18–19, 22–24).  Defendant further
21  contends that the "taint" of the 1929 UAA infects the current illegal entry law he is
22  charged with violating, a contention which is based in part on factual findings in Carrillo-
23  Lopez.  Def. Mot. at 19.

24          Defendant's argument lacks merit.  ***First***, the "challenged action" is the 1952 INA
25  because it contains the law that was codified as 8 U.S.C. § 1326.  Defendant has not
26  identified any legislative history of the 1952 INA for the Court to consider; therefore,
27  there is no basis to draw the inference that racial animus was a motivating factor in its
28  passage.  ***Second***, if the Court nonetheless were to consider the legislative history of the

1929 UAA, the additional context we provide casts serious doubt as to the veracity of Defendant's conclusion that racism and eugenics were a motivating factor in its passage. **Third**, there is no disparate impact; rather, the fact that more Mexican and Latinx persons are prosecuted under § 1326 is purely a function of the fact that the United States shares a 1,954-mile land border with Mexico.

### 1. Racial Animus Was Not A Motivating Factor for The Passage Of The "Challenged Action"—The 1952 INA

Step one in the <u>Arlington Heights</u> analysis is to identify the "challenged action." 429 U.S. at 261-62, 265. The parties dispute what that action is. Defendant contends that it is the 1929 UAA. Def. Mot. at 4. He is wrong. The 1952 INA contains the law that was codified as § 1326, which is the statute Defendant is charged in count 2 with violating and is the statute that would be stricken down were the Court to agree with Defendant. Further, there is no evidence before the Court that racial animus was a motivating factor in the passage of the 1952 INA.

### a. Summary of The Passage of The 1952 INA

The Immigration Act of 1917 established that an alien who, within three years after entry, entered the United States at any time or place other than as designated by immigration officials, or who entered without inspection, shall be deported. Pub. L. No. 64-301, § 19, 39 Stat. 874, 889, Ch. 29. Deportation was the only penalty for reentry.

When it passed the 1929 UAA, the 70th Congress made reentry after deportation a felony offense punishable by up to two years in prison and up to a $1,000 fine. Pub. L. No. 70-1018, 45 Stat. 1551, Ch. 690. This was done to strengthen the deterrent effect of the immigration laws. S. Rep. No. 70-1456 at 1 (Jan. 17, 1929) (noting that there was no law providing any penalty other than deportation for unlawful reentry, explaining that this legislation would make illegal reentry a felony offense punishable by up to two years' imprisonment and a $1,000 fine, which "is believed . . . would be of material aid in enforcing our immigration laws"). The Secretary of the Department of Labor—who was charged at that time with enforcing the country's immigration laws—agreed. In a letter

incorporated into the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws[,]" explaining that "no prohibitive law can successfully be enforced without a deterrent penalty," and "[t]he fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions." Id. at 2.

The 82nd Congress passed the 1952 INA. Pub. L. 82-414, 66 Stat. 163, Ch. 477. The 1952 INA "revise[d] the laws relating to immigration, naturalization, and nationality" and expressly repealed the 1929 Act. Pub. L. 82-414, Introduction, 66 Stat. 163, § 403(a)(30), 66 Stat. 279. The passage of the 1952 INA was "the final product of a most intensive and searching investigation and study over a three-year period." Pena-Cabanillas v. United States, 394 F.2d 785, 790 (9th Cir. 1968), abrogation on other grounds recognized by United States v. Castillo-Mendez, 868 F.3d 830, 835-36 (9th Cir. 2017); see also, e.g., Oscar M. Trelles, II and James F. Bailey, III, 1 Immigration and Nationality Acts:  Legislative Histories and Related Documents at iii (Introduction) (1979).

In recommending that the House pass H.R. 5678, the bill that became the 1952 INA, the report of the House Judiciary Committee mentioned only the following with respect to illegal reentry:

> As in existing law, both administrative fines and civil and criminal penalties are provided as an aid in the enforcement of the provisions of the bill.
>
> ***
>
> [C]riminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes.

H. Rep. 82-1365 at 67, 68.  This shows that the fundamental purpose of the penalties in § 1326 was to assist the enforcement of immigration laws.  See Hernandez-Guerrero, 147

F.3d at 1078.  And this is the same purpose expressed for the illegal-reentry penalties adopted in the 1929 UAA.  See S. Rep. No. 70-1456 at 1-2 (Jan. 17, 1929).

The 1952 INA also removed all racial bars to immigration and naturalization.  See Pub. L. 82-414, §§ 201, 202, 311, 66 Stat. 163, 175-78; H. Rep. 82-1365 at 28.  Further, like under the Immigration Act of 1924, see Pub. L. No. 68-139, § 4, 43 Stat. 153, 155, the 1952 INA provided that individuals born in the Republic of Mexico—as well as those born in Canada and several other countries—were not subject to immigration quotas.  See Pub. L. 82-414, § 101, 66 Stat. 163, 169 ("The term 'nonquota immigrant' means— . . . an immigrant who was born in Canada, the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America, and the spouse or the child of any such immigrant, if accompanying or following to join him[.]").

Section 276 of the 1952 INA was codified at 8 U.S.C. § 1326 and established the following felony offense for reentry of a deported alien—also punishable by up to two years in prison and a $1,000 fine:

> Any alien who—
>
> > (1) has been arrested and deported or excluded and deported, and thereafter
> >
> > (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,
>
> shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

Pub. L. 82-414, § 276, 66 Stat. 229, codified at 8 U.S.C. § 1326; see also E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 756 (9th Cir. 2018) (discussing history of immigration laws and the 1952 INA).

12

Congress has amended § 1326 several times since the 1952 INA was enacted, and lawmakers have increased its deterrent value with each amendment.  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (100th Congress adding a subsection (b) to § 1326 and creating enhanced penalties for aliens with prior felony convictions); Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(3), 104 Stat. 4978, 5059 (increasing the fine levels; amending the fine provision so that a defendant convicted shall be fined under 18 U.S.C.); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (amending and increasing penalties under subsection (b)); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 507(c), 438(b), 441 110 Stat. 1214, 1267-68, 1276, 1279 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, §§ 241(b), 244(d)(3)(J), 334, 110 Stat. 3009-606, -618,  -635 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

### b.    The 1952 INA Is the Challenged Action

Arlington Heights requires proof of discriminatory intent as to "the challenged action."  429 U.S. at 261–62, 265.  Logic dictates that the 1952 INA is the challenged action—Defendant is charged with violating § 1326, which was codified when the 1952 INA was passed, and § 1326 would be stricken down were the Court to agree with Defendant's analysis.  Defendant, however, maintains that the 1929 UAA is the challenged action based on a theory that racial animus motivated the passage of the 1929 UAA and the taint of that animus was not cleansed when the 1952 INA was passed. Def. Mot. at 19.  We show below that Defendant's contentions miss the mark.

Generally, "the starting point in discerning congressional intent is the existing statutory text, not the predecessor statute."  Lamie v. U.S. Trustee, 540 U.S. 526, 527 (2004) (internal citations omitted).  Implicit in this statement is that Congressional intent may not carry over when a statute is amended or replaced.  See United States v. Price,

361 U.S. 304, 332 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); Order at 7, Palacios-Arias, No. 3:20-CR-62-JAG, ECF No. 37 ("Just as 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one,' the views of an *earlier* Congress 'form a hazardous basis for inferring the intent of' a later one." (quoting Price, 361 U.S. at 313)). Several Circuits have declined to infer discriminatory intent from a previous enactment, instead choosing to focus on the law being challenged.  E.g., Hayden v. Paterson, 594 F.3d 150, 165-69 (2d Cir. 2010); Johnson v. Governor of Fla., 405 F.3d 1214, 1223-24 (11th Cir. 2005) (en banc); Cotton v. Fordice, 157 F.3d 388, 392 (5th Cir. 1998).

Particularly relevant is the fact that when addressing the same challenge to § 1326 that Defendant brings here, insofar as we can tell, every district court decision that has addressed the matter (other than the legally flawed Carrillo-Lopez decision) has ignored the 1929 UAA.  That has been the case in this Court.  E.g., Gallegos-Aparicio, 2020 WL 7318124, at *4-7 (rejecting defendant's challenge to § 1325; explaining that "Arlington Heights directs the Court to look at the motivation behind the official act being challenged" and "[t]he Court therefore must consider whether [defendant] has shown that Congress's *1990 enactment of Section 1325* was motivated at least in part by a discriminatory purpose"; and concluding that "the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for [defendant's] position") (emphasis added); Rios-Montano,  2020 WL 7226441 at *7–14 (same); Lucas-Hernandez, 2020 WL 6161150 at *2 ("Defendant's Arlington Heights analysis of § 1325(a)(1) is fatally flawed because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); Ruiz-Rivera, 2020 WL 5230519, at *3 ("Defendant's Arlington Heights analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on the legislative history of the UAA, a law that was enacted decades before.").

That has been the case in other courts as well.  The District of New Mexico recently stated that the circuit cases cited two paragraphs above "have rejected the notion that prior

congressional intent remains operative until a future Congress makes an affirmative contrary showing." Novondo-Ceballos, 2021 WL 3570229, at *5 (citations omitted) (ruling that § 1326 survives rational basis review after rejecting the same Arlington Heights argument raised here). Similarly, the Eastern District of Virginia stated:

> That history [of the 1929 UAA], however, d[oes] little to explain why Congress passed the [INA], the law that replaced the Undesirable Aliens Act of 1929 and that the defendant allegedly violated. To challenge the INA using Arlington Heights, the defendant must provide evidence that a discriminatory purpose motivated Congress to pass that law. He has not done so here.

Palacios-Arias, 3:20-CR-62-JAG, ECF No. 37 at 5; see also United States v. Gutierrez-Barba, No. CR-19-01224-001, 2021 WL 2138801, at *3-*4 (D. Ariz. May 25, 2021) (declining to consider the legislative history of the 1929 UAA and rejecting challenge brought under Arlington Heights); Order at 5-6, United States v. Medina, No. CR 20-0057 (C.D. Cal. Jan. 5, 2021) ECF No. 33 (same).

Defendant nonetheless urges the Court to focus on the provocative portions of the legislative history of the 1929 UAA that he has quoted in his brief. To support this request, he points to two Supreme Court cases that purportedly support his position: Ramos v. Louisiana, 140 S. Ct. 1390, 1392–1402, 1408 (2020), and Espinoza v. Montana Department of Revenue, 140 S. Ct. 2246, 2251-53, 2254–63 (2020). Def. Mot. at 19. According to Defendant, these cases confirm not only that "must courts examine the racial motivations of the law at the time of its passage, but that later reenactments do not cleanse the law of its original taint." Def. Mot. at 20. In other words, Defendant contends that the taint of the lawmakers' racist comments made when passing the 1929 UAA was not cleansed when the 1952 INA was enacted because those comments were not addressed by the 80th Congress. Id.

Defendant, however, mischaracterizes these cases. As an initial matter, neither cites Arlington Heights, which is not surprising given that neither resolved a challenge brought under an Equal Protection Clause. Ramos, 140 S. Ct. at 1410 (Sotomayor, J., concurring in part); Espinoza, 140 S. Ct. at 2263 n.5. In Ramos, the Supreme Court held

that the Sixth Amendment requires unanimous jury verdicts to convict in federal and state cases, and accordingly, it invalidated Louisiana and Oregon laws that allowed convictions by non-unanimous juries. 140 S. Ct. at 1392–1402, 1408. The Court acknowledged the undisputed evidence that "race was a motivating factor in the adoption" of these states' laws. Id. at 1394. But the Court performed a textual analysis of the Sixth Amendment and overruled an earlier Supreme Court decision that had permitted Oregon and Louisiana to convict by non-unanimous juries; the Court did not delve into or rely on legislators' motivations for enacting these laws. Id. at 1395–1402.

In Espinoza, the Court concluded that applying a "no aid" provision in Montana's constitution to bar the use of state scholarships to attend religious schools violated the Free Exercise Clause of the First Amendment. 140 S. Ct. at 2251–53, 2254–63. The majority did not rely on any "checkered tradition" underlying the no-aid provision—contrary to Defendant's contention on page 20 of his motion; instead, the majority relied on the fundamental point that the provision violated the First Amendment because it "plainly exclude[d] schools from government aid solely because of their religious status." Espinoza, 140 S. Ct. at 2255, 2259.

Simply put: these two Supreme Court decisions do not stand for what Defendant says they do. It is not surprising, then, that this Court and others have disregarded these cases when resolving the same equal protection challenge Defendant brings here. E.g., Gallegos-Aparicio, 2020 WL 7318124, at *4-*5; Rios-Montano, 2020 WL 7226441, at *4 (same); Order at 6 n.7, Palacios-Arias, No. 3:20-CR-62-JAG, ECF No. 37; Lucas-Hernandez, 2020 WL 6161150, at *2-*3; Ruiz-Rivera, 2020 WL 5230519, at *3; Novondo-Ceballos, 2021 WL 3670229, at *4-*5; Gutierrez-Barba, 2021 WL 2138801, at *4; Order at 4-5, Medina, No. 20-cr-0057, ECF No. 33 (C.D. Cal. Jan. 5, 2021). Defendant failed to provide any basis for the Court to reach a different conclusion than the one reached in these decisions.

Moreover, in all of the cases Defendant cited in which Arlington Heights was applied to strike down a law, the courts limited their review to the history of the statute

16

or ruling being challenged.  That is to say: Defendant has not identified a case that applied Arlington Heights the same way he urges the Court to do here, which is to strike down a law based on its predecessor statute's legislative history that may support an inference that the earlier law was passed in part due to discriminatory intent.

In sum, the case law dictates that the Court must focus that the legislative history of the law being challenged.  Thus, if the Court reaches Defendant's Arlington Heights argument, it should conclude that the 1952 INA is the challenged action and should limit its review to the legislative history of that statute.

### c.   The Legislative History Of The 1952 INA Shows That There Were Legitimate Reasons for § 1326

The legislative history of the 1952 INA that we briefly described above shows that racism was not a motivating factor for its passage.  Rather, as explained above in section III(A)(1), Congress appears to have been concerned with assisting in the enforcement of immigration laws.  In fact, as also noted in section III(A)(1) above, the INA *removed* racial bars to immigration and naturalization for persons from Mexico and other parts of Latin America and their families.[3]

Defendant has not submitted to the Court any legislative history or other evidence that pertains to the passage of the 1952 INA.  Rather, Defendant requests that the Court adopt the factual findings made by the Nevada court in Carrillo-Lopez that racial animus factored into the passage of that law.  Def. Mot. at 20–21 (urging the Court to "examine the evidence upon which that district court relied, and to adopt those findings in this case to rule that the 1952 enactment was also motivated by a discriminatory purpose").  But whatever evidence was produced in that case concerning the 1952 INA has not been

---

[3] It is noteworthy that the 82nd Congress that passed the 1952 INA shared only 21 members (less than 4 percent) with the 70th Congress, which passed the 1929 UAA.  See Order at 7 n.8, Palacios-Arias, No. 3:20-CR-62, ECF No. 37.  By 1952, the individuals Defendant cites in the context of the 1920s legislation, see Def. Mot. at 8-17, were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or dead (Coleman Blease, James Davis, John Box, Harry Laughlin).

supplied to this Court.[4]  And this Court cannot take judicial notice of the Nevada court's findings of fact. E.g., M/V Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983) ("[A] court may not take judicial notice of proceedings or records in another case so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it.").

As shown in the previous section, Defendant's argument that the racist comments that were made by some lawmakers during the debate of the 1929 UAA "taints" the passage of the 1952 INA not only finds no support in the case law he cites, it is contradicted by other case law.  Therefore, the legislative history of the 1929 UAA is not relevant to this case.   Because Defendant has presented no evidence that racial animus appears in the legislative history of the 1952 INA, his Arlington Heights argument fails.

### 2. It Is Not Clear That Racial Animus Motivated The Passage Of The 1929 UAA

Even were the Court to assume for the sake of argument that the legislative history relating to the 1929 UAA is relevant, the Court should be dubious about accepting Defendant's characterization of the motivation for its passage.  This is so, because Defendant relies on the affronting opinions of fewer than ten of the 531 members of the 70th Congress to argue that racism was the "primary" factor motivating the passage of the 1929 UAA.  In making this argument, however, Defendant eschews statements by some of those same lawmakers that show that when the 1920s laws were being debated, Congress had broader concerns about economic issues and was not simply motivated by animus toward Mexican and Latinx persons.  Should the Court consider Defendant's arguments concerning racial animus, it should also consider more than just the provocative remarks he has reproduced.

---

[4] Defendant should not be permitted to submit those materials now should he request to do so because there is no reason why they could not have been included with his motion. See Graf, 610 F.3d at 1166; Bazuaye, 79 F.3d at 120.

For example, Defendant states that Rep. Thomas Blanton "complained that Mexicans 'come into Texas by hordes[.]'" Def. Mot. at 15 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  Defendant's brief fails, however, to mention that a moment later, Rep. Blanton discussed the need to preserve jobs for America citizens, asserting that "They are taking away jobs from American citizens."  70 Cong. Rec. 3619 (1929).  Defendant also cites Rep. Blanton as "urg[ing] the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there.'"  Def. Mot. at 15 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  Defendant omits the very next sentence, which again is tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]"  70 Cong. Rec. 3619 (1929).

As a second example, Defendant writes that Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'"  Def. Mot. at 15 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)).  The very next words in that quoted passage—which has a comma after "ever going back," not a period—are "coming across to get jobs of Americans[.]"  70 Cong. Rec. 3619 (1929); see also id. (stating that "it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.").

And as third and fourth examples, Defendant also selectively quotes Reps. Schafer and Box.  Defendant cites Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]"  Def. Mot. at 15 (quoting Mot. Ex. C, 70 Cong. Rec. 3619 (1929)). The full original quote is: "These Mexicans also come into Wisconsin in droves, and take the places of American citizens in the factories and on the farm.  Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor."  70 Cong. Rec. 3619 (1929).  And on pages 12, 13, 14, 16, and 17 of his motion, Defendant notes several startling comments of Rep. Box.  But Rep. Box also commented during congressional debate about the issue of jobs

for his constituents: "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now."  70 Cong. Rec. 3619 (1929).[5]

We recognize, of course, that the opinions quoted by Defendant were reprehensible. But those opinions are the only part of the story that Defendant tells.  As outlined above, even a shallow dive into the legislative history of the immigration laws from the 1920s reveals a more complicated picture than Defendant has provided, and a closer examination casts doubt on Defendant's assertion that the racial animus expressed by a handful of lawmakers constituted a "motivating factor" for the passage of the 1929 UAA (much less, as he states on page 17 of his motion, "the ***primary*** factor").  Arlington Heights, 429 U.S. at 265.  On this point, United States v. O'Brien is instructive:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. ***It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.***

391 U.S. 367, 383-84 (1968) (emphasis added).

Further, Defendant's reliance on "the cat's paw" doctrine is misplaced.  Def. Mot. at 16.  In Hobbs, which Brnovich overruled, the Ninth Circuit relied upon this doctrine to

---

[5] Defendant also cites a "radio speech" by Rep. Robert Green in January 1928, which were read into the record by another representative.  Def. Mot. at 12 (quoting Mot. Ex. F, 70 Cong. Rec. 2461 (1928)).  Even in light of his race-related comments, Rep. Green was not targeting Mexicans, but appears focused mainly on an overall strengthening of immigration law and resources.  70 Cong. Rec. 2461 (1928) (noting the "tremendous situation" facing immigration authorities, "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States," the "immigration department" employed only 2,700 people—"inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol," and the burden, threat, and "economic loss," as he saw it, to public institutions).

attribute discriminatory intent to legislators who had not expressed it.[6]  <u>Hobbs</u>, 948 F.3d at 1041 ("The good-faith belief of these sincere legislators does not show a lack of discriminatory intent behind H.B. 2023.  Rather, it shows that well meaning legislators were used as 'cat's paws.'").  Likewise, Defendant invokes this doctrine to argue that "Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the 'inferiority' of the 'Mexican race' during legislative sessions in the five years leading up to the law's passage[,]" suggesting that those who sat silent agreed with their colleagues who voiced racist opinions.  Def. Mot. at 17 (citing <u>Hobbs</u>, 948 F.3d at 1041).  But the Supreme Court has stated that this theory "has no application to legislative bodies," <u>Brnovich</u>, 141 S. Ct. at 2350, which undercuts Defendant's assertion that racism was the primary factor for the passage of the 1929 UAA.

In short, Defendant asks the Court to do what the Supreme Court has cautioned should not be done—strike down § 1326 based on the opinions of "fewer than a handful of Congressman" expressed during the debate on a law that is no longer in effect, and also to attribute those affronting opinions to the entire 72nd Congress.  <u>Brnovich</u>, 141 S. Ct. at 2350; <u>O'Brien</u>, 391 U.S. at 383-84. For the reasons stated in this section, the Court should decline to do so.

### 3.   Defendant Fails To Establish Discriminatory Impact

Finally, Defendant argues that § 1326 has a disparate impact and discriminatory intent based on the high percentage of Border Patrol arrests of Mexican or Latinx individuals and other claimed subset disparities.  Def. Mot. at 22-24.  Those, however, numbers do not establish that § 1326 violates his equal protection rights.

We provide the latest available figures for context.  In Fiscal Year 2019, Border Patrol had 859,501 total encounters,[7] of which 851,508—99.1 percent—were on the

---

[6] "The doctrine is based on the fable, often attributed to Aesop, in which a clever monkey induces a cat to use its paws to take chestnuts off of hot coals for the benefit of the monkey." <u>Hobbs</u>, 948 F.3d at 1041.
[7] U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021: Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (accessed Sept. 2, 2021)

southwest border of the United States.[8]  In Fiscal Year 2020, Border Patrol had 405,036 total encounters,[9] and 400,651—98.9 percent—of those occurred on the southwest border.[10] In light of these data, it is unsurprising that a high percentage of apprehensions (and potentially prosecutions) are of Mexican or Latinx individuals.

Data such as these do not show disparate impact or discriminatory intent sufficient to sustain an equal protection challenge.  In  DHS v. Regents of the Univ. of Cal., for example, the Supreme Court considered and rejected the argument that the rescission of the DACA program disparately impacted Latinx people from Mexico (who were 78 percent of DACA recipients), concluding: "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program.  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (citation omitted). But more importantly, this Court in Gallegos-Aparicio concluded that defendant's "conten[tion] that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border" did not "show discriminatory motive, given that the disparity is explainable on grounds other than race."  No. 19-CR-2637-GPC, at *8 (citing Arlington Heights, 429 U.S. at 266); accord Rios-Montano, No. 19-CR-2123-GPC, 2020 WL 7226441, at *14-*16 (reaching same conclusion); Order at 6 n.7, Palacios-Arias, No. 3:20-CR-62-JAG, ECF No. 37 (same); Lucas-Hernandez, 2020 WL 6161150, at *2-*3 (same); Ruiz-Rivera, 2020 WL 5230519, at *4 (same).  Defendant's brief does not address these common-sense conclusions concerning the impact § 1326 has, and for

---

[8] U.S. Customs and Border Protection,  Southwest Border Migration FY 2019:  U.S. Border Patrol Southwest Border Apprehensions FY 2019 (Nov. 14, 2019), https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019 (accessed Sept. 1, 2021).

[9] U.S. Customs and Border Protection, CBP Enforcement Statistics Fiscal Year 2021: Total CBP Enforcement Actions, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (accessed Sept. 1, 2021)

[10] U.S. Customs and Border Protection, Southwest Border Migration FY 2020:  U.S. Border Patrol Southwest Border Apprehensions FY 2020 (Nov. 19, 2020), https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2020 (accessed Sept. 1, 2021).

1  this additional reason, Defendant fails to show that the statute violates his equal protection

2  rights under <u>Arlington Heights</u>.

3        Finally, because Defendant cannot, as a matter of law, establish his equal protection

4  claim even under <u>Arlington Heights</u>, the Court should not hold an evidentiary hearing on

5  his motion to dismiss.  Def. Mot. at 24-25 (requesting hearing); <u>United States v. Irwin</u>,

6  612 F.2d 1182, 1187 (9th Cir. 1980) (stating standard for when an evidentiary hearing

7  may be conducted on a motion to dismiss).

8                                           **IV**

9                                    <u>**CONCLUSION**</u>

10       For the foregoing reasons, Defendant's motion should be denied.

11       DATED:  October 15, 2021                    Respectfully submitted,

13                                                    RANDY S. GROSSMAN
                                                      Acting United States Attorney

15                                                    */s/Lyndzie M. Carter*
16                                                    LYNDZIE M. CARTER
                                                      Assistant U.S. Attorney